# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-1317
_____

United States of America

*Plaintiff - Appellee*

v.

David Wayne Holleman

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: October 25, 2013
Filed: February 27, 2014

_____

Before BYE, SMITH, and BENTON, Circuit Judges.

_____

BYE, Circuit Judge.

David Holleman entered a conditional plea of guilty to possessing marijuana with the intent to distribute, reserving the right to appeal the district court's[1] denial of a motion to suppress evidence found in Holleman's vehicle while it was parked in a

---

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa, adopting the report and recommendation of the Honorable Jon Stuart Scoles, United States Magistrate Judge for the Northern District of Iowa.

hotel parking lot. Holleman also sought to suppress incriminating statements he made to police officers before they searched his vehicle. In this appeal, Holleman claims the officers violated his constitutional rights on a number of grounds. Finding no constitutional violations, we affirm.

I

On May 8, 2012, Holleman was driving a white Chevrolet truck on Interstate 80 through Iowa. An Iowa State Patrol trooper observed Holleman traveling at seventy-three miles per hour (in excess of the posted speed limit of seventy miles per hour) and following too closely behind another vehicle. The trooper initiated a routine traffic stop to issue Holleman a warning ticket. While questioning Holleman during the course of the traffic stop, the trooper became suspicious of Holleman's behavior. For example, Holleman opened the passenger-side window of the truck just one inch when the trooper approached the truck, refused to roll the window down any farther at the trooper's request, and slid his license, registration and insurance card through the one-inch opening in the window.

Approximately seven minutes into the traffic stop, the trooper asked Holleman for permission to search the truck and to walk a drug dog around the truck. Holleman declined to give permission. The trooper nonetheless deployed his drug dog while Holleman waited in the patrol car. The trooper's drug dog did not successfully sniff the truck, however, because it was distracted by the smell of a dead animal in the ditch. The trooper then issued a warning ticket to Holleman and told him he was free to leave.

Feeling as if the traffic stop did not "go the way a normal traffic stop should go," the trooper called ahead to a Drug Enforcement Administration (DEA) Task Force officer and described Holleman's truck and travel route. The DEA officer located Holleman's truck and followed the truck until Holleman parked in a hotel parking lot. The DEA officer then called local law enforcement and located an officer with a drug dog.

While Holleman's truck was parked in the hotel parking lot, a local law enforcement officer deployed his drug dog, Henri, to sniff Holleman's truck. The handling officer first directed Henri to conduct a "free air sniff" of several vehicles located in another part of the parking lot. In all, Henri sniffed four vehicles before reaching Holleman's truck. Henri did not alert, indicate, or otherwise change his behavior when sniffing the first four vehicles. When Henri finally reached the passenger side of Holleman's truck, however, he "stop[ped] dead in his tracks and be[gan] to really detail the area between the bed of the truck and the cab of the truck." The handling officer characterized Henri's reaction as an "alert." The officer then pulled Henri away from Holleman's truck and directed him to sniff the vehicle parked next to Holleman's truck. Henri did not alert, indicate, or otherwise change his behavior while sniffing that vehicle. The handling officer then took Henri back to Holleman's truck and directed him to sniff the truck again. On this second sniff, Henri "stopped and detailed the same area as the first time." Based on Henri's two alerts to Holleman's truck, law enforcement obtained a search warrant. While executing the search warrant, officers found approximately 250 pounds of marijuana hidden inside two arc welders located in the bed of the truck.

While some officers obtained the search warrant, Holleman waited in the parking lot with other officers. During the wait, an officer engaged Holleman in conversation, asking him if the arc welder units in the bed of the truck were his. Holleman replied affirmatively. When the officer asked Holleman where he purchased the welders and for what price, Holleman said he wanted to speak to an attorney before answering any additional questions.

Based on the evidence seized during the search, a federal grand jury returned a one-count indictment against Holleman charging him with possession with intent to distribute 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). Holleman filed a motion to suppress the evidence found in his truck. He also sought to suppress the statements he made to officers in the hotel parking lot.

Holleman claimed the initial stop of his vehicle violated the Fourth Amendment and therefore tainted the subsequent search of his vehicle. He also claimed infirmities in the search warrant application invalidated the search warrant, Henri's drug sniff did not provide probable cause for the search, and the automobile exception to the search warrant requirement did not apply under the circumstances present in this case. Finally, he claimed he was in custody when he made incriminating statements about the arc welders, and thus the officers violated his Miranda[2] rights by asking him questions without advising him of his right to remain silent.

A magistrate judge conducted an evidentiary hearing over the course of three days. Following the hearing, the magistrate judge issued a detailed report and recommendation to the district court recommending that the suppression motion be denied. Holleman filed an objection to the report and recommendation. The district court adopted the report and recommendation, and denied the motion to suppress. The district court held no constitutional violations occurred in the initial stop of Holleman's truck that may have tainted the subsequent search. The district court also found Henri's drug sniff was reliable enough to provide probable cause for a search of the truck, and the truck's location in a hotel parking lot put it within the automobile exception to the search warrant requirement (thus any infirmities in the search warrant application were irrelevant). Finally, the district court determined Holleman failed to object to the magistrate judge's finding that Holleman was not in custody when he made statements to law enforcement officers in the hotel parking lot, and thus Holleman's request to suppress his statements was not properly preserved for review. In the alternative, the district court held the magistrate judge correctly found Holleman was not in custody at the time he made the potentially incriminating statements.

After the denial of his suppression motion, Holleman entered a conditional guilty plea to the charge of possessing marijuana with the intent to distribute,

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

preserving the right to appeal the denial of his motion. The district court sentenced Holleman to sixty months in prison. Holleman filed this timely appeal.

## II

In an appeal challenging the denial of a suppression motion, we review the district court's fact findings for clear error, and its legal conclusions de novo. United States v. Parish, 606 F.3d 480, 486 (8th Cir. 2010).

### A.    The Initial Traffic Stop and First Drug Dog Sniff

Holleman first contends the initial stop of his truck on Interstate 80 was not supported by probable cause. The district court, however, found credible the trooper's testimony that Holleman was driving seventy-three miles per hour in an area where the posted speed limit was seventy miles per hour. Holleman has not shown the district court's fact finding to be clearly erroneous, and the fact that Holleman was driving in excess of the posted speed limit was reason enough to support the initial stop. See, e.g., United States v. Coleman, 700 F.3d 329, 334 (8th Cir. 2012) ("A traffic violation, no matter how minor, provides an officer with probable cause to stop the driver.").

Holleman also claims the trooper unreasonably extended the length of the initial stop to conduct the first drug dog sniff. Holleman argues this unreasonable extension of the initial stop violated the Fourth Amendment, and this alleged constitutional violation was a "but-for" cause of Henri's subsequent drug sniff and the search of the vehicle. See United States v. Peralez, 526 F.3d 1115, 1121 (8th Cir. 2008) ("Only if the constitutional violation was 'at least a but-for cause of obtaining the evidence' is suppression of evidence the appropriate remedy." (quoting United States v. Olivera-Mendez, 484 F.3d 505, 511 (8th Cir. 2007))). This argument fails. The trooper was already suspicious of Holleman's behavior when he employed his drug dog during the initial traffic stop. The trooper's suspicions – already present at the time he deployed

his drug dog – were the but-for cause of his follow-up contact with the DEA officer. Thus, any alleged unreasonable extension of the first traffic stop was not the but-for cause of the second drug dog sniff or the search of Holleman's truck. The district court therefore did not err in denying the request to suppress evidence on the grounds that an unreasonable extension of the first traffic stop tainted the subsequent investigation.

      B.     The Second Drug Dog Sniff and Search of the Vehicle

Holleman contends Henri's drug sniff did not provide probable cause to search his vehicle. He argues Henri only "alerted" to the possible presence of drugs without actually "indicating" the presence of drugs, and that a mere "alert" is insufficient to support probable cause for a search.[3] Holleman relies primarily on United States v. Jacobs, 986 F.2d 1231 (8th Cir. 1993). Jacobs involved a drug dog who showed "interest" in a package by pushing it around with his nose and scratching it twice. Id. at 1233. We held a warrant application which said a drug dog merely showed "interest" in a package would not be supported by probable cause. Id. at 1235. Holleman argues Henri's two "alerts" were the equivalent of the "interest" shown by the drug dog in Jacobs. We disagree. The whole point of Jacobs was the distinction between a drug dog's mere "interest" and a dog giving a "full alert" to a package. Id.

Some courts have held a trained drug dog's "alert," as opposed to the more conclusive "indication," is enough to establish probable cause. See United States v. Parada, 577 F.3d 1275, 1282 (10th Cir. 2009) ("Thus, the general rule we have followed is that a dog's alert to the presence of contraband is sufficient to provide

---

[3]An "alert" occurs when a dog detects the odor of the drugs he is trained to locate. In this case, Henri gave two "alerts" by making two abrupt stops to detail a particular area of the truck with intense closed-mouth sniffing. An "indication" occurs when a dog identifies the location of the strongest source of the drug odor. In this case, Henri was trained to sit or lie down when he had "indicated" the strongest source of the drug odor. Henri did not sit or lie down in this case.

probable cause.  We decline to adopt the stricter rule urged by Mr. Parada, which would require the dog to give a final indication before probable cause is established.");  see also United States v. Clayton, 374 F. App'x 497, 502 (5th Cir. 2010) ("[O]ur Fourth Amendment jurisprudence does not require drug dogs to abide by a specific and consistent code in signaling their sniffing of drugs to their handlers.  So long as officers are able to articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics, this Court will not engage itself in the evaluation of whether that dog should have used alternative means to indicate the presence of the drugs.").  Here, Henri's handling officer explained the dog's failure to give a full "indication" may have been because Henri was so overwhelmed by the odor of marijuana that he had difficulty pinpointing the strongest source of the odor.  More to the point, the handling officer testified Henri gave two definitive "alerts" to the side of Holleman's truck.  As a result, we are not concerned about Henri's failure to give a full indication, and do not find Holleman's reliance upon Jacobs persuasive.

In Florida v. Harris, __ U.S. __, 133 S. Ct. 1050 (2013), the Supreme Court discussed the framework courts should use to determine whether a drug dog sniff is reliable enough to give police officers probable cause to conduct a search.  The appropriate inquiry is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.  A sniff is up to snuff when it meets that test."  Id. at 1058.  The Supreme Court said more emphasis should be placed on a dog's performance in controlled settings than its performance "in the field."  133 S. Ct. at 1056.

> [T]he decision below treats records of a dog's field performance as the gold standard in evidence, when in most cases they have relatively limited import.  Errors may abound in such records.  If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. . . . Conversely (and more relevant here), if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all.  The dog

may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person.

Id. The Supreme Court also said "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." Id. at 1057.

Here, the record showed Henri and his handler were first certified through the Northern Michigan K-9 school as a narcotics detection team in October 2009. Henri and his handler thereafter successfully completed annual re-certifications between the time of their initial certification and the search of Holleman's vehicle. In addition, to the extent actual field performance is still relevant, the record shows Henri's "in-field" accuracy record was 57%. In United States v. Donnelly, 475 F.3d 946 (8th Cir. 2007), we affirmed the denial of a suppression motion despite the fact that the drug dog involved there had an even lower 54% "in-field" accuracy rating. Id. at 955.

Finally, the totality of the facts involved in this case include the Trooper's suspicions about Holleman during the initial traffic stop on Interstate 80. The district court summarized the Trooper's suspicions as follows:

> (1) Defendant failed to open the passenger side window more than one inch when Trooper Clyde first approached Defendant's truck; (2) Defendant provided a hesitant answer regarding where he was going; (3) Defendant had a Washington state license plate and stated that he was driving the arc welders in his truck to Washington D.C. but curiously stated that he was dropping off only one of the two arc welders in D.C. and that the other arc welder belonged to him; (4) Defendant's stated occupation—video producer—was inconsistent with the arc welders; and (5) Trooper Clyde believed that Defendant was displaying nervous energy and was breathing heavily.

United States v. Holleman, No. 12-CR-40-LRR, 2012 WL 6201748 at *6 (N.D. Iowa Dec. 12, 2012).

Considering "all the facts surrounding [Henri's] alert[s], viewed through the lens of common sense," we conclude those facts "would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Florida v. Harris, 133 S. Ct. at 1058. We are thus satisfied Henri's sniffs were "up to snuff." Id.

Holleman also argues certain infirmities in the application used to obtain the search warrant for his truck invalidated the search warrant itself. In response, the government argues the search of Holleman's truck fell within the automobile exception to the search warrant requirement, and thus the search did not violate the Fourth Amendment so long as it was supported by probable cause. We agree any infirmities in the search warrant application are irrelevant so long as the search of the vehicle fell within the automobile exception to the search warrant requirement. See United States v. Martinez, 78 F.3d 399, 401 (8th Cir. 1996) (concluding a search may be authorized under the automobile exception even when law enforcement obtains a search warrant later determined to be invalid).

To determine whether the automobile exception to the search warrant requirement applies, Holleman's truck must have been "readily capable" of "being used on the highways" and must have been "found stationary in a place not regularly used for residential purposes[.]" California v. Carney, 471 U.S. 386, 392 (1985). Holleman does not contend his truck was incapable of being used on the highways, so the first prong of the test is not at issue. The sole issue is whether the truck's location in a hotel parking lot put it in a place not regularly used for residential purposes.

In United States v. Reed, 733 F.2d 492 (8th Cir. 1984), we held a defendant did not have a reasonable expectation of privacy in a "fenced but open back parking lot" of a business. Id. at 501. In United States v. Roby, 122 F.3d 1120 (8th Cir. 1997), we

held a drug dog sniff in a hotel hallway did not violate the Fourth Amendment. Id. at 1124. The government argues a hotel parking lot should not be considered a place regularly used for residential purposes if the protections of the Fourth Amendment do not extend even to the hallway of a hotel (or to the parking lot of a business).

Other circuits have specifically addressed whether a hotel parking lot should be considered "residential" for purposes of the automobile exception to the search warrant requirement, and have concluded not. See United States v. Washburn, 383 F.3d 638, 641-42 (7th Cir. 2004) ("We have always rejected the notion that a hotel occupant enjoys the same expectation of privacy in his car in the parking lot of the hotel as he does in the room itself; the hotel parking lot is readily accessible to the public and not generally thought of as a place normally used as a residence." (internal quotation marks and citation omitted)); United States v. Diaz, 25 F.3d 392, 396-97 (6th Cir. 1994) (concluding motel guests have no reasonable expectation of privacy in a motel's parking lot); United States v. Ludwig, 10 F.3d 1523, 1526-27 (10th Cir. 1993) (concluding a drug sniff of a vehicle parked in a hotel parking lot did not violate the Fourth Amendment); United States v. Foxworth, 8 F.3d 540, 545 (7th Cir. 1993) (stating a hotel parking lot is "readily accessible to the public and not generally thought of as a place normally used as a residence.").

Holleman contends these cases have been called into doubt by the Supreme Court's recent decision in Florida v. Jardines, __ U.S. __, 133 S. Ct. 1409 (2013). Jardines involved a drug dog sniff which occurred on the front porch of someone's residence. The Supreme Court found law enforcement officers' entry into the home's curtilage constituted a physical intrusion into a constitutionally protected area, proceeded to examine whether law enforcement officers had a license to enter such an area, and determined they did not. 133 S. Ct. at 1415. Holleman claims a hotel parking lot is like the front porch of someone's home, and thus a police officer's license to be in such an area is limited. Holleman argues the limited license of a police officer to be in the quasi-residential area of a hotel parking lot does not include the right to bring a trained drug dog into the area to conduct a drug sniff.

-10-

We decline to address whether <u>Jardines</u> casts doubt on those cases which hold a hotel parking lot is a place not regularly used for residential purposes. The Supreme Court issued its opinion in <u>Jardines</u> on March 26, 2013. The search of Holleman's truck occurred almost a full year earlier on May 8, 2012. Even assuming <u>Jardines</u> casts doubt on previous cases involving the search of a vehicle in a hotel parking lot – a question we need not address – suppression of the evidence discovered in Holleman's truck would not be appropriate; the police officers who searched Holleman's truck were entitled to an objective reasonable reliance on existing judicial precedent. <u>See</u> <u>Davis v. United States</u>, __ U.S. __, 131 S.Ct. 2419, 2428 (2011). We therefore conclude the district court did not err when it determined the search of Holleman's truck fell within the automobile exception to the search warrant requirement.

C.      The Statements Made in the Hotel Parking Lot

Finally, Holleman contends he was "in custody" in the hotel parking lot when he told officers the arc welder units in the bed of his truck were his, and thus the officers violated his <u>Miranda</u> rights by not informing him of his right to remain silent before asking him questions.

To determine whether an interrogation is custodial under <u>Miranda</u>, we apply the six factor test set forth in <u>United States v. Griffin</u>, 922 F.2d 1343 (8th Cir. 1990). Those factors are:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the

-11-

questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. at 1349. The ultimate question is whether a reasonable person would feel free to leave under the totality of the circumstances, that is, "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation marks and citation omitted).

Applying the Griffin factors here confirms the district court correctly found Holleman was not in custody. The officers never told Holleman he had to stay in the hotel parking lot, or that he could not leave if he so chose. Holleman was not restrained by the officers while they waited for the search warrant. The officer who asked Holleman if he owned the arc welders did not employ any strong arm tactics or deceptive stratagems. Both Holleman and the officer were in an open area, an outside parking lot, when the questions were asked. In addition, the officers did not limit Holleman's freedom to use his cell phone. Thus, although it may have been clear to Holleman that his *vehicle* could not leave while officers waited for the search warrant, we do not believe a reasonable person in Holleman's position would believe he was not free to leave the parking lot.

III

We affirm the decision of the district court.

_____